COMMONWEALTH vs. WILLIAM F. DINKINS.

Suffolk. November 7, 2003. - January 22, 2004.

Present: GREANEY, SPINA, COWIN, SOSMAN, & CORDY, JJ.

*Homicide. Practice, Criminal,* Capital case, Motion to suppress, Loss of evidence by prosecution, Preservation of evidence, Instructions to jury, Assistance of counsel.

A Superior Court judge did not abuse his discretion in denying a criminal defendant's motion to suppress testimony about ballistics evidence that had been destroyed by the Commonwealth, where the defendant did not make any evidentiary showing to support his proposition that access to the destroyed evidence would have helped rather than hurt his case, and where, while the Commonwealth's level of culpability in destroying the evidence was high, the level of materiality and potential prejudice was low. [717-720]

At a criminal trial, the judge did not err in instructing the jury that inferences drawn from circumstantial evidence need only be "reasonable and possible." [720-721]

At the trial of an indictment charging the defendant with murder in the first degree on a theory of felony-murder, the defendant's counsel was not ineffective for failing to highlight a particular inconsistency during closing argument to the jury, where counsel effectively probed that inconsistency and many others in the course of cross-examining a prosecution witness, and aggressively attacked that witness's credibility in light of a plea agreement and his extensive criminal record, and where counsel's decision to emphasize other aspects of the case during closing argument was not manifestly unreasonable. [721-722]

INDICTMENT found and returned in the Superior Court Department on November 9, 1998.

A pretrial motion to suppress evidence was heard by *James D. McDaniel, Jr.,* J., and the case was tried before him.

*Richard J. Shea* for the defendant.

*Susanne Levsen Reardon,* Assistant District Attorney, for the Commonwealth.

CORDY, J. After a jury trial, William F. Dinkins was found guilty of felony-murder in the first degree. On appeal, he argues

that his motion to suppress testimony about ballistics evidence destroyed by the Commonwealth was wrongly denied, that his trial counsel was ineffective in failing to highlight an inconsistency in the trial testimony during his closing argument, and that the trial judge incorrectly instructed the jury regarding the inferences that they might draw from circumstantial evidence. Dinkins also contends that the cumulative impact of errors at trial warrants a new trial pursuant to G. L. c. 278, § 33E. Having considered Dinkins's claims and undertaken a complete review of the trial record, we affirm his conviction.

1. *Background.*

We recite the facts as the jury could have found them. Cosimiro Dos Santos worked at Sunshine Variety, a convenience store in the Dorchester section of Boston. On the evening of November 9, 1989, two men entered the store. Each wore a hooded sweatshirt that obscured his face. One wielded a knife, and the other wielded a gun. They took money and food stamps from the cash register. They also shot and killed Cosimiro Dos Santos. For nine years, the murder was unsolved.

In the late 1990's, the Boston police department began to reinvestigate homicides that had gone unsolved. In 1998, a Boston police detective investigating the Sunshine Variety robbery and murder discovered that .25 caliber shell casings found at the store and the bullet taken from Dos Santos's body had previously been matched to ballistics evidence taken from two other shootings that occurred in Dorchester in November, 1989. The ballistics evidence from those shootings had been further matched to a .25 caliber handgun that police had seized on November 22, 1989, from a bedroom shared by Adell Joyner and his best friend, Dinkins.[1] The detective also learned that Joyner had been convicted in January, 1990, of armed assault in connection with one of the other shootings. Joyner was subsequently arrested for the murder of Dos Santos, and confessed to participating with Dinkins in the robbery and murder of the Sunshine Variety store. At trial he testified, under

_____

[1] The handgun was seized during a search authorized by warrant. Both Adell Joyner and William Dinkins were present when the gun was found by police in their bedroom.

a plea agreement with the Commonwealth, that Dinkins carried the gun and fired the shots that killed Dos Santos.[2,3]

2. *Discussion.*

a. *Motion to suppress.* In the intervening nine years between the seizure of the handgun and the reinvestigation of the murder, while addressing storage overflow problems in the ballistics unit, the Boston police department had destroyed the gun and some of the ballistics evidence. As a consequence, Dinkins moved to suppress testimony and ballistics reports matching the shells and bullets retrieved in the investigation of the murder of Dos Santos with those retrieved at the other shootings and with the .25 caliber gun found in Dinkins's room, claiming that the unavailability of the gun and the other ballistics evidence precluded him from conducting independent tests and thereby developing exculpatory evidence. The trial judge, citing *Commonwealth* v. *Patten*, 401 Mass. 20 (1987), denied the motion, concluding that the defendant had not made a showing "[b]eyond fertile imagination" that there was a reasonable possibility that access to the ballistics evidence would have produced favorable evidence.

"A defendant who seeks relief from the loss or destruction of potentially exculpatory evidence has the initial burden . . . to establish 'a "reasonable possibility, based on concrete evidence rather than a fertile imagination," that access to the [evidence] would have produced evidence favorable to his cause' . . . . *Commonwealth* v. *Neal*, 392 Mass. 1, 12 (1984). If he meets his initial burden . . . '[a court] must weigh the culpability of the Commonwealth, the materiality of the evidence, and the potential prejudice to the defendant.' *Commonwealth* v. *Willie*, 400 Mass. 427, 432 (1987). When reviewing the denial of a motion to dismiss [or suppress] based on the Commonwealth's alleged loss of exculpatory evidence, we . . . will not disturb the judge's decision [absent] a clear abuse of discretion." (Cita-

---

[2]The relevant terms of Joyner's plea agreement were that he would plead guilty to manslaughter and receive a sentence of fifteen years.

[3]Whether Dinkins was carrying the gun or the knife during the armed robbery that resulted in Dos Santos's death is legally insignificant in this case. The Commonwealth's theory, however, was that Dinkins had the gun and fired the shots.

tions omitted.) *Commonwealth* v. *Cintron*, 438 Mass. 779, 784 (2003).

Dinkins did not make any evidentiary showing to support his proposition that access to the gun and to the missing shell casings would have helped rather than hurt his cause. It is not enough for a defendant merely to argue, as Dinkins did below and does here in his brief, that, with access to the evidence, his expert "could have made potentially exculpatory findings." Standing as it does, "could have" is merely an introduction to speculation and is not a substitute for "concrete evidence." *Id.* There was no abuse of discretion, and there is no basis to disturb the judge's denial of the motion to suppress. See *Commonwealth* v. *O'Day*, *ante* 296, 307 (2003) (affirming denial of motion to dismiss due to inadequate showing that Commonwealth's intentional destruction of infernal device denied defendant access to exculpatory evidence); *Commonwealth* v. *Cintron*, *supra* at 785 (affirming denial of motion to dismiss or suppress due to defendant's failure to show that access to original fingerprint would have provided evidence more favorable than did access to photographs of fingerprint); *Commonwealth* v. *Gomes*, 403 Mass. 258, 277 (1988) (holding that defendant failed to show that lack of photographs of test plates used to analyze blood stains prejudiced his case); *Commonwealth* v. *Neal*, 392 Mass. 1, 12 (1984) (finding that defendant could not show that access to ampules used in breath analysis would have produced evidence favorable to his cause).

Even if the judge had engaged in a weighing of culpability, materiality, and prejudice, the balance would not have tilted in the defendant's favor. While the Commonwealth's level of culpability was high,[4] that consideration would not have

---

[4]The police officer responsible for the destruction testified that, before destroying any evidence, it was his procedure to review the files in the ballistics unit to determine whether there was a case pending against the individual to whom the evidence was tied and, if there was none, to contact the Federal Bureau of Alcohol, Tobacco, and Firearms to determine whether that agency had any need for the evidence; if the agency had no need of the evidence, the officer would contact the police in the area where the original incident occurred to determine whether there were any further complaints in the case. It is left unexplained how the ballistics in this case could have been destroyed in the absence of inexcusable carelessness, where the file that the

prevailed in light of the low levels of materiality and potential prejudice.[5]

Although the ballistics evidence was material, the Commonwealth's case was centered on the testimony of Joyner, an admitted participant in the crime. The principal issue at trial was the credibility of his testimony that Dinkins was the person with him during the robbery. It was not contested that Joyner was one of the two people involved, that Dos Santos was killed by a .25 caliber bullet, that a .25 caliber handgun had been seized from a room shared by Joyner and Dinkins in 1989 (a few weeks after the murder), or that Joyner had used that handgun in another (nonfatal) shooting at around that same time.[6] The ballistics evidence ultimately proved most important as the investigator's road to identifying Joyner as a likely participant in the crime and securing his testimony.

The potential prejudice also was low. To the extent that the Commonwealth did rely on the matches of the ballistics evidence, Dinkins was able to use the absence of the gun to discredit the ballistician's testimony, and in turn to create doubt about the Commonwealth's case. Through cross-examination, Dinkins's attorney demonstrated that the ballistics expert who matched the gun to the shootings could not remember the particular characteristics on which he based the match, and could not prove that, as required by procedure, he secured a second opinion to verify his determination of the match. The opportunity to plant these seeds of doubt in the minds of the jury was undoubtedly a great deal more than Dinkins would have accomplished had the evidence been available for further testing. Although it may be possible for two ballisticians to

officer testified he reviewed before destroying the gun contained cross-references and documentation showing a match to the gun used in the unsolved Sunshine Variety murder.

[5] Dinkins also argues that the Commonwealth's culpability is compounded by the nine-year delay between the crime and the time that the Commonwealth brought the indictments against Dinkins and Joyner. We disagree. The Commonwealth's negligence lies in its destruction of a gun that it already had matched to an unsolved homicide, not in the unintended delay in successfully completing its investigation.

[6] Dinkins was identified at trial by Joyner and an eyewitness as the shooter in a third incident occurring in November, 1989, involving the same .25 caliber handgun. His involvement in this shooting was contested at trial.

analyze the same evidence and come to different conclusions, see *Commonwealth* v. *Ellis*, 373 Mass. 1, 5-6 (1977) ("Commonwealth's two [ballistics] experts did not fully agree"), the recognized reliability of ballistics analysis and the Commonwealth's expert's unchallenged assertion of the continuity in ballistics analysis methods over the time since the tests were performed make it highly likely that additional tests would have mirrored the results of those already done and thereby bolstered the Commonwealth's case.[7] See Peterson, Crime Laboratory Proficiency Testing Results, 1978-1991, II: Resolving Questions of Common Origin, 40 J. Forensic Sci. 1009, 1018-1019, 1028 (1995).

b. *Instruction to the jury.* In his instructions to the jury, the judge stated: "The inferences drawn by the jury need only be reasonable and possible. Let me say that again. The inferences drawn by the jury need only be reasonable and possible, and need not be necessary or inescapable." Dinkins objected, and here argues that, "by inviting the jury to draw inferences that are merely 'possible,' [the judge] erroneously lowered the Commonwealth's burden of proof." There was no error. The judge's instruction accurately stated the law, in no way invited the jury to draw inferences that were "merely possible," and properly maintained the Commonwealth's high burden.

We repeatedly have held that inferences drawn from circumstantial evidence need only be "reasonable and possible." See, e.g., *Commonwealth* v. *Wallis*, ante 589, 593 (2003); *Commonwealth* v. *Evans*, 439 Mass. 184, 200, cert. denied, 124 S. Ct. 323 and 124 S. Ct. 445 (2003); *Newman* v. *Commonwealth*, 437 Mass. 599, 602 (2002); *Commonwealth* v. *Marshall*, 434

---

[7]Contrast *Commonwealth* v. *Olszewski*, 401 Mass. 749 (1988), *S.C.*, 416 Mass. 707 (1993), cert. denied, 513 U.S. 835 (1994), and *Commonwealth* v. *Sasville*, 35 Mass. App. Ct. 15 (1993), where critical physical evidence that, if tested, could have exonerated the defendants was lost before tests were performed. In *Olszewski, supra* at 757, we required suppression of testimony about and photographs of the untested evidence, but directed the trial judge to determine the admissibility of other already tested (but lost) evidence on remand. In *Sasville, supra* at 22-27, the Appeals Court dismissed a rape indictment where the complainant alleged that she became pregnant as a result of the rape, but the Commonwealth destroyed the resultant highly material fetal tissue without having conducted or permitted the defendant to conduct any blood testing of it.

Mass. 358, 361 (2001); *Commonwealth* v. *Lodge*, 431 Mass. 461, 465 (2000). In this formulation, "possible" is not a lesser alternative to "reasonable." Rather, the two words function in a synergistic manner: each raises the standard imposed by the other. The defendant's argument, understanding the words as equally sufficient alternatives, would have us replace the conjunction with a disjunction. We see no reason to do so, and we cannot imagine that a jury would, either.[8]

c. *Ineffective assistance of counsel.* There was substantial evidence at trial that the robbery and murder occurred between 5 and 5:30 P.M. on November 9, 1989. On direct examination, however, Joyner testified that he and Dinkins attended a party before committing the robbery at the store, and that the party began "in the night time." Dinkins's attorney probed this point on cross-examination and succeeded in getting Joyner to elaborate further that he and Dinkins arrived at the party at some point between 6 and 6:30 P.M., stayed for a "few hours," and robbed Sunshine Variety after they left. On appeal, Dinkins argues that his trial counsel was ineffective for failing to highlight this inconsistency during closing argument to the jury.

"In cases of murder in the first degree, we review claims of ineffective assistance of counsel by ascertaining whether there was error committed by . . . defense counsel . . . and if so whether such error created a substantial likelihood of a miscarriage of justice." *Commonwealth* v. *Lynch*, 439 Mass. 532, 537 (2003), cert. denied, 124 S. Ct. 833 (2003). In our consideration of whether there was error, we give due deference to attorneys' tactical decisions, and have held that "[a]n attorney's tactical decision amounts to ineffective assistance of counsel only if it was manifestly unreasonable when made." *Commonwealth* v. *Gaboriault*, 439 Mass. 84, 90 (2003), quoting *Commonwealth* v. *Coonan*, 428 Mass. 823, 827 (1999).

Here, defense counsel effectively probed this inconsistency and many others in the course of cross-examining Joyner. Defense counsel also aggressively attacked his credibility in

---

[8]The rule with regard to the permissibility of inferences drawn from circumstantial evidence — "reasonable and possible" — applies as equally to a judge evaluating the sufficiency of the evidence as it does to a jury making fact determinations.

light of the plea agreement and his extensive criminal record. In deciding what to highlight during closing argument, counsel inevitably had to make strategic choices with regard to emphasis and importance, all in the context of the time allotted to such argument. It is apparent from the transcript that Dinkins's attorney chose to draw the jury's attention to inconsistencies between the testimony of eyewitnesses and Joyner as to the size and build of the person with him on the night of the robbery, the inability of the Commonwealth's ballistician to specify the characteristics on which he based his match of the gun found in Dinkins's bedroom to the bullet and shell casings found at Sunshine Variety, Joyner's plea agreement and motive for implicating Dinkins as the shooter, and a number of false statements that Joyner had made to the police during the investigation.

We have not held or suggested that the failure of counsel to mention every inconsistency in trial testimony during closing argument could ever be a ground for a finding of ineffectiveness. Moreover, the decision to emphasize other aspects of the case during argument was not manifestly unreasonable here. During trial, counsel had developed a great deal of material that went to the heart of the question of Joyner's credibility, and could have well concluded that the jury would not be terribly impressed by a witness's inconsistency as to the time of the robbery, when that witness had admitted participating in it but was testifying to each detail more than twelve years after it had occurred.

d. *General Laws c. 278, § 33E, review.* Pursuant to our duties under G. L. c. 278, § 33E, we have reviewed the entire record of the proceedings. We find no reason to reverse or to reduce Dinkins's conviction of murder in the first degree.

*Judgment affirmed.*